**Catherine ORTIZ, Plaintiff,**

v.

**The BROOKSTONE CO. and Steve Black, Defendants.**

**No. 00 Civ.8153 JGK.**

United States District Court,
S.D. New York.

July 29, 2003.

458

Daniel Cherner, Law Office Dan Cherner, New York City, for Plaintiff.

Helen Elizabeth Tuttle, Pitney, Hardin, Kipp & Szuch LLP, Morristown, NJ, Joel L. Finger, New York City, for Defendants.

### OPINION AND ORDER

KOELTL, District Judge.

The plaintiff, Catherine Ortiz ("Ortiz"), brings this action against her former employer, The Brookstone Company, Inc. ("Brookstone") and her former supervisor, Steve Black ("Black"). The plaintiff alleg-

es that the defendants discriminated against her on the basis of race, color, ethnicity, and gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") and the New York Human Rights Law, N.Y. Exec. Law § 296, and on the basis of race, color and ethnicity in violation of 42 U.S.C. § 1981. The plaintiff also brings claims for breach of contract and intentional infliction of emotional distress under New York State law. The defendants now move for summary judgment pursuant to Fed.R.Civ.P. 56.

The evidence submitted to the Court reflects the following facts as construed in the light most favorable to the plaintiff. Brookstone is a nationwide retailer and direct marketing company that specializes in selling innovative gifts that are functional, uniquely designed, and not widely available to the public. (Affidavit of David Zack ("Zack") sworn Jan. 29, 2003 ("Zack Aff.") ¶ 3.) Brookstone operates more than 210 stores nationwide and in Puerto Rico. (*Id.*) Many of the stores, including the Westchester Mall store where the plaintiff worked, are located in regional shopping malls. (*Id.;* Def. Rule 56.1 St. ¶ 1; Pl. Resp. Rule 56.1 St. ¶ 1.)

Ortiz, who describes herself as a female of Hispanic ethnicity, race, and color and of Puerto Rican descent, was hired as a Manager in Training ("MIT") at Brookstone's Westchester Mall store in White Plains, New York in or about September 1999. (Compl.¶¶ 3, 9–10.) At that time Ortiz had over seven years of retail experience as both an assistant manager and manager of various retail stores. (*Id.* at ¶ 12.) Black was the Store Manager of the Westchester Mall store and was Ortiz's direct supervisor for the entire term of her employment at Brookstone. (Affidavit of Steven Black sworn Jan. 29, 2003 ("Black Aff.") ¶ 2.)

Staffing of a typical Brookstone store includes a store manager, who supervises a first assistant store manager, a second assistant store manager, and approximately eight to fifteen full-time and part-time sales associates. (Zack Aff. ¶ 4.) Brookstone also employs MITs such as the plaintiff who Brookstone has identified as having the potential to become a store manager at a future time. (*Id.*) MITs serve as an extra first assistant manager. (*Id.*)

The management team of each Brookstone store is responsible for that store's overall performance. (*Id.* at ¶ 5.) Evaluation of a store's performance includes compliance with Brookstone's loss prevention procedures which are aimed at minimizing the extent to which the individual store, and the company as a whole, loses money due to theft or loss of Brookstone's assets. (*Id.*) Violations of the loss prevention policies can subject an employee to discipline, including termination. (*Id.*) Brookstone's loss prevention policies include specific procedures to be followed by store management in making daily bank deposits of cash and checks received in the store. (*Id.* at ¶ 6.) The store manager, first and second assistant managers, and MITs all hold responsibilities related to preparing, transporting, and making bank deposits. (*Id.*)

Every Brookstone employee is required, at the outset of his or her employment, to review and understand Brookstone's Asset Protection Policy. (Black Aff. ¶ 7; *see also* Brookstone Asset Protection Policy ("Asset Protection Policy") attached as Ex. 3 to Black Aff.) Ortiz signed written acknowledgments that she had read and understood the Asset Protection Policy on August 26, 1999 and March 15, 2000. (Brookstone Asset Protection Policy Acknowledgments attached as Ex. 4 to Black Aff.) In so doing, Ortiz acknowledged that failure to abide by the policies would result

in "warning, suspension, discharge or other disciplinary action appropriate to the policy that was violated." (*Id.*)

As an MIT, Ortiz was responsible for assisting the Store Manager, Black, in managing the store and assuming Black's duties in his absence. (Black Aff. ¶ 4.) Like the Store Manager, an MIT's responsibilities include sales generation, human resources, staffing and training, merchandising, controlling expenses, loss prevention and store maintenance and aesthetics. (*Id.*; MIT Job Description dated May 3, 1999 attached as Ex. 2 to Black Aff.) Loss prevention is one of an MIT's major responsibilities. (Black Aff. ¶ 6.) When Ortiz was hired, it was expected that she would become a Store Manager in 6–12 months. (Black Aff. ¶ 5; Affidavit of Catherine Ortiz sworn Apr. 14, 2003 ("Ortiz Aff.") ¶ 2.)

Brookstone's loss prevention policies include specific procedures for making daily bank deposits of cash and checks received in the store. (Black Aff. ¶ 8; Brookstone Policies & Procedures: Store Bank Deposits ("Deposit Procedures") attached as Ex. 5 to Black Aff.) Brookstone's company-wide policy is for Store Managers to make bank deposits at the close of each business day usually accompanied by a sales associate. (Deposit Procedures; Zack Aff. ¶ 7; Black Aff. ¶ 9.) However, the policy at the Westchester Mall store was adapted after a November 3, 1999 loss prevention audit because the bank used by the store was not located within the mall but across the street, and the physical layout of the off-site bank did not satisfy the company's security requirements. (Black Aff. ¶¶ 9–10; Zack Aff. ¶¶ 8–9.) After the November 3, 1999 loss prevention audit, Zack, who was the Associate District Manager responsible for the Westchester Mall store at the relevant time, gave Black a documented verbal warning for failing to properly supervise the daily bank deposits.

(Zack Aff. ¶ 10 n. 1; Brookstone Report of Policy/Performance Discussion dated Nov. 3, 1999 attached as Ex. 1 to Zack Aff.)

Following the audit at the Westchester Mall store, deposits were to be made by the opening manager on the next business day before opening the store, although the opening manager did not need to be accompanied by a sales associate. (Zack Aff. ¶¶ 8–9; Black Aff. ¶ 10.) If the opening manager was unable to make the deposit prior to opening the store for any reason, the opening manager was required to notify either the Store Manager or the District Manager. (Zack Aff. ¶ 9; Black Aff. ¶ 10.) The clarification of the bank deposit policy was verbally communicated to all individuals responsible for making bank deposits at the Westchester Mall store including the plaintiff, who Black informed personally of the new policy. (Zack Aff. ¶ 10; Black Aff. ¶ 11.) Ortiz denies that she was ever so informed. (Ortiz Aff. ¶ 23.)

In January 2000, Zack and Black were notified that a bank deposit for over $11,000 constituting the cash and check receipts of the Westchester Mall store for December 24, 1999 (a Friday) was never made. (Zack Aff. ¶ 11; Black Aff. ¶ 12.) As the manager who opened the store on December 27, 1999 (a Monday), Ortiz was responsible for ensuring that the receipts from December 24, 1999 and December 26, 1999 (a Sunday) were deposited in the bank prior to opening the store. (Zack Aff. ¶ 11; Black Aff. 12.) If either of the deposits were missing or if Ortiz could not bring the receipts to the bank prior to opening, Ortiz was required to notify the Store Manager or District Manager. (Zack Aff. ¶ 11; Black Aff. ¶ 12.) Although Ortiz deposited the receipts from December 26, 1999, she failed to do so with the December 24, 1999 receipts and did not notify her supervisors about the missing deposit. (Zack Aff. ¶ 11.)

LP Innovations, Inc. conducted an investigation into the missing deposit on Brookstone's behalf after Black was unable to locate a validated deposit slip from the bank. (Zack Aff. ¶ 12; Black Aff. ¶ 13.) Brookstone also reported the matter to the White Plains Police Department, although the money's whereabouts has never been determined. (Zack Aff. ¶ 12; Black Aff. ¶ 13.)

In February 2000 Black completed a performance appraisal for Ortiz in which he deemed her overall performance "marginal," one step above the lowest rating. (Black Aff. ¶ 14; Performance Appraisal attached as Ex. 6 to Black Aff. at 13.) The Performance Appraisal noted that "our lack of attention to loss prevention procedures resulted in a lost deposit of $10,000." (Performance Appraisal at 10.)

On March 17, 2000, while the investigation into the missing deposit remained ongoing, Ortiz again failed to deposit cash and receipts from the previous day prior to opening the Westchester Mall store and failed to report that the deposit was delayed to a supervisor. (Zack Aff. ¶ 13; Black ¶ 15.) Black discovered the deposit when he went to verify the previous day's paperwork and noticed that the March 17, 2000 validated deposit slip had not been entered into the store's ledger. (Black Aff. ¶ 15.) Black made a note of the incident in his weekly review of the store and notified Zack of the incident. (Id.)

On April 7, 2000, after consulting with Rhoda McVeigh from Brookstone Human Resources, Zack terminated Ortiz due to her irresponsible handling of bank deposits. (Zack Aff. ¶ 14; Black Aff. ¶ 16; Brookstone Report of Policy/Performance Improvement Discussion attached as Ex. 2 to Zack Aff.)[1] Ortiz was fired as a result of

the missing December 24, 1999 deposit for which she was responsible as the opening manager. (Zack Aff. ¶ 14.) Ortiz's failure to make the deposit resulted in a loss of over $11,000 to Brookstone. (Id.) In addition, the March 17, 2000 procedural violation, coming so soon after the missing December 24, 1999 deposit, created too great a risk for Brookstone to continue to employ the plaintiff. (Id.; Black Aff. ¶ 17.)

As a result of Black's management failures regarding the bank deposit policies, Black received a probationary warning on April 27, 2000. (Zack Aff. ¶ 15; Probationary Warning attached as Ex. 3 to Zack Aff.) The probationary warning did not result from any violation of the bank deposit policy by Black himself. (Zack Aff. ¶ 15.) Black remained on probation as of January 29, 2003 when Zack swore to his affidavit. (Id.)

## I.

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Gallo v. Prudential Residential Servs. Ltd. P'ship,* 22 F.3d 1219, 1223 (2d Cir.1994). "The trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to

---

1. The Zack Affirmation appears to misstate the date as April 7, 2002 rather than April 7, 2000, the date listed in the Black Affirmation and on the Report of Policy/Performance Improvement Discussion.

deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo,* 22 F.3d at 1224. The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. The substantive law governing the case will identify those facts which are material and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)); *see also Gallo,* 22 F.3d at 1223. Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 37 (2d Cir.1994). If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). The nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." *Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir.1993); *see also Scotto v. Almenas,* 143 F.3d 105, 114–15 (2d Cir. 1998) (collecting cases).

## II.

The defendants seek summary judgment on the plaintiff's claim that she was discriminated against allegedly because of her race, color, gender and ethnicity.

The plaintiff's claims for discrimination under Title VII and the New York Human Rights Law, and for discrimination in violation of § 1981, are all employment discrimination claims, and are governed at the summary judgment stage by the burden-shifting analysis established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Torres v. Pisano,* 116 F.3d 625, 629 n. 1 (2d Cir.1997) (claims arising under the New York Human Rights Law analytically inseparable from Title VII claims); *Bennett v. Watson Wyatt & Co.,* 136 F.Supp.2d 236, 245 n. 4 (S.D.N.Y.2001) (claims under Title VII, § 1981 and the New York Human Rights Law analyzed under the *McDonnell Douglas* burden shifting framework). Under the *McDonnell Douglas* test, the plaintiff carries the initial burden of establishing a prima facie case of discrimination. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (citing *McDonnell Douglas* ); *Fisher v. Vassar College,* 114 F.3d 1332, 1335 (2d Cir.1997). To state a prima facie case of discrimination the plaintiff must allege that she (1) is a member of a protected class; (2) was performing her job satisfactorily; (3) was subjected to an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *St. Mary's Honor Ctr.,* 509

U.S. at 507, 113 S.Ct. 2742; *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *Chambers,* 43 F.3d at 37; *Ali v. Bank of New York,* 934 F.Supp. 87, 92 (S.D.N.Y. 1996). However, the burden of establishing a prima facie case is de minimis. *Chambers,* 43 F.3d at 37.

■ When a plaintiff has successfully demonstrated the elements of a prima facie case, the burden of production shifts to the defendant to put forth a legitimate, nondiscriminatory reason for the employer's challenged action. *See Burdine,* 450 U.S. at 252–53, 101 S.Ct. 1089. After the defendant articulates a legitimate reason for the action, the presumption of discrimination raised by the prima facie case drops out, and the plaintiff has the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision and that her membership in a protected class was. *Id.* at 254–56, 101 S.Ct. 1089; *Fisher,* 114 F.3d at 1336. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089; *see also Reeves,* 530 U.S. at 143, 120 S.Ct. 2097; *Fisher,* 114 F.3d at 1336. The Court of Appeals for the Second Circuit has instructed that in determining whether the plaintiff has met this burden, a court is to use a "case by case" approach that evaluates "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports [or undermines] the employer's case." *James v. New York Racing Ass'n,* 233 F.3d 149, 156 (2d Cir.2000) (quoting *Reeves,* 530 U.S. at 148–49, 120 S.Ct. 2097). Although summary judgment must be granted with caution in Title VII actions "where intent is genuinely in issue, ... summary judgment remains available to

reject discrimination claims in cases lacking genuine issues of material fact." *Chambers,* 43 F.3d at 40.

■ The plaintiff has failed to establish a prima facie case of discrimination because she has not shown that any reasonable person could find that she was terminated under circumstances giving rise to an inference of discrimination. The plaintiff's sole allegation that she was terminated under such circumstances is that she was not treated in the same way as Black, a white male. Ortiz alleges that Black also violated Brookstone's loss prevention policies but was not fired for having done so.

■ To establish the fourth element of the *McDonnell Douglas* test, Ortiz must show that she was treated differently from Black with whom she was "similarly situated." To be "similarly situated" Ortiz must be similarly situated to Black in "all material respects." *Shumway v. United Parcel Service, Inc.,* 118 F.3d 60, 64 (2d Cir.1997) (citing *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir.1992)). To be similarly situated for purposes of establishing a prima facie case, Ortiz and Black "must have been subject to the same standards governing performance evaluation and discipline, and [Black] must have engaged in conduct similar to the plaintiff's...." *Norville v. Staten Island Univ. Hosp.,* 196 F.3d 89, 96 (2d Cir.1999) (quoting *Mazzella v. RCA Global Communic., Inc.,* 642 F.Supp. 1531, 1547 (S.D.N.Y.1986), *aff'd,* 814 F.2d 653 (2d Cir.1987)); *accord Graham v. Long Island R.R.,* 230 F.3d 34, 40 (2d Cir.2000).

Ortiz had not shown that she is similarly situated to Black. Black was a Store Manager and Ortiz was an MIT. Black was Ortiz's direct supervisor, a permanent employee of Brookstone, and had responsibilities different from those of Ortiz. Moreover, Ortiz and Black were disciplined for wholly different conduct. Ortiz was termi-

nated after she directly violated the asset protection policies causing Brookstone to lose in excess of $11,000. During the investigation into the loss, Ortiz again failed to deposit the previous day's earnings in a timely manner, further undermining the company's confidence in her as an employee. Black, by contrast, was given a probationary warning on account of his management failures regarding Brookstone's bank deposit policies, and was not found to have personally violated the policies themselves. In view of these facts, it cannot be said that Ortiz and Black are similarly situated. *See Norville,* 196 F.3d at 96; *Shumway,* 118 F.3d at 64. *Cf. McGuinness v. Lincoln Hall,* 263 F.3d 49, 54 (2d Cir.2001) (plaintiff and coworker similarly situated when both held positions of roughly equivalent rank, namely both were members of the defendant's Executive Cabinet). Therefore, Ortiz has not established a prima facie case of discrimination.[2]

 In addition, even if the plaintiff had presented sufficient evidence of a prima facie case, the defendants have plainly presented non-discriminatory reasons for their actions—the plaintiff's pattern of failing to follow the asset protection policies and the resulting loss of over $11,000 to Brookstone. In light of the non-discriminatory reasons proffered by the defendants, the plaintiff has the opportunity to show that these reasons were merely a pretext for discrimination. The plaintiff has failed to do so. There is simply no

evidence of discrimination. Brookstone hired the plaintiff only seven months before she was fired. The plaintiff offers no evidence of any discriminatory remarks or any statistical data to suggest that Brookstone maintained discriminatory practices. The plaintiff's sole allegation is that Brookstone treated her differently from Black. In this case, in the absence of evidence of discrimination and in the face of the clearly non-discriminatory reasons proffered by the defendants, no reasonable juror could find that discriminatory animus was a motivating factor in Ortiz's termination. *See Tanay v. St. Barnabas Hosp.,* No. 99 Civ. 9215, 2001 WL 262695, at *6–7 (S.D.N.Y. Mar. 15, 2001); *Alleyne v. Four Seasons Hotel New York,* No. 99 Civ. 3432, 2001 WL 135770, at *11–13 (S.D.N.Y. Nov. 11, 2002), *aff'd,* 25 Fed.Appx. 74, 2002 WL 109353 (2d Cir.2002) (table).

### III.

The defendants move for summary judgment on Ortiz's breach of contract claim. The defendants claim that the plaintiff was employed "at will" and that, as a result, Brookstone could terminate her at any time. The plaintiff argues that Brookstone's freedom to terminate her was constrained by statements in the Brookstone Performance Improvement Process policy ("Improvement Policy"). (Improvement Policy attached as Ex. G to Declaration of Dan Cherner dated Apr. 12, 2003.)

---

**2.** Ortiz relies on *Abdu–Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456 (2d Cir.), *cert. denied,* 534 U.S. 993, 122 S.Ct. 460, 151 L.Ed.2d 378 (2001), for the proposition that she need not establish circumstances giving rise to an inference of discrimination by showing that she was treated differently from a similarly situated employee. *Abdu–Brisson* found that a showing of disparate treatment of similarly situated employees is only one way to discharge the plaintiff's burden regarding the fourth prong of the *McDonnell*

*Douglas* test. However, the Court of Appeals found that there was other evidence giving rise to an inference of age discrimination, particularly a pattern of derogatory statements against a background of "all consuming interest in the age and projected retirement rates" of the plaintiffs. *Id.* at 468. In this case, the plaintiff claims that she is, in fact, similarly situated to another employee and has shown no circumstances in any other respect giving rise to an inference of discrimination.

Under New York law, a term of employment for an indefinite period of time is presumed to be "a hiring at will that may be freely terminated by either party at any time for any reason or even for no reason." *Lobosco v. New York Tel. Co./NYNEX*, 96 N.Y.2d 312, 727 N.Y.S.2d 383, 751 N.E.2d 462, 464 (2001) (citation omitted). Despite this presumption, if an employee can prove that "(1) an express written policy limiting the employer's right of discharge exists, (2) the employer (or one of its authorized representatives) made the employee aware of this policy, and (3) the employee detrimentally relied on the policy in accepting or continuing employment," the policy becomes part of the employment contract. *Baron v. Port Auth. of New York and New Jersey*, 271 F.3d 81, 85 (2d Cir.2001) (citing *Lobosco*, 727 N.Y.S.2d 383, 751 N.E.2d at 462); *see also Weiner v. McGraw–Hill, Inc.*, 57 N.Y.2d 458, 457 N.Y.S.2d 193, 443 N.E.2d 441, 445–46 (1982).

Employee manuals and similar "[r]outinely issued" documents "should not lightly be converted into binding employment agreements." *Lobosco*, 727 N.Y.S.2d 383, 751 N.E.2d at 465. In this case, Ortiz alleges breach of contract because Brookstone allegedly failed to comply with the Improvement Policy when terminating her. This argument is without merit.

Although the Improvement Policy details the process by which a Brookstone employee can be disciplined or fired, Ortiz puts forth no evidence that she was made aware of the Improvement Policy or detrimentally relied on it. Moreover, the policy itself states that the performance improvement policy outlined within is only *"generally* progressively applied and takes into consideration the Associate's entire employment record, however, in cases where serious performance issues exist, it may be appropriate to proceed directly to the ...

'Discharge' stage[ ]." (Improvement Policy at 2.) Zack terminated Ortiz in consultation with Brookstone's human resources department after she caused Brookstone to lose over $11,000. Nothing about that action violated the Improvement Policy.

## IV.

The plaintiff also alleges that the defendants' actions constituted intentional infliction of emotional distress. The defendants move for summary judgment on this claim on the ground that the plaintiff has failed to proffer sufficient evidence to satisfy the elements for this claim.

Under New York law, the elements of a claim for intentional infliction of emotional distress are: "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir.1996); *see also Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir.1999). The plaintiff has failed to proffer sufficient evidence to satisfy these elements. The New York Court of Appeals has adopted the Restatement (Second) of Torts' explanation of this cause of action, which notes that "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Murphy v. American Home Prod. Corp.*, 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86, 90 (1983); *see also Cohn–Frankel v. United Synagogue of Conservative Judaism*, 246 A.D.2d 332, 667 N.Y.S.2d 360, 361 (1st Dep't 1998). This standard is extremely high and exacting. *See Stylianou v. St. Luke's/Roosevelt Hosp. Ctr.*, 902 F.Supp. 54, 58 (S.D.N.Y.1995).

 The plaintiff's allegations in this case do not meet the rigorous standard followed by courts applying New York law. Ortiz raises no facts supporting a claim for intentional infliction of emotional distress. In connection with her termination, she alleges only that an investigation into the missing $11,000 was performed and that she was dismissed. The plaintiff does not allege "some combination of public humiliation, false accusations of criminal or heinous conduct, verbal abuse or harassment, physical threats, permanent loss of employment, or conduct contrary to public policy." *Stuto*, 164 F.3d at 828. Nor does Ortiz proffer evidence of any emotional distress or psychiatric diagnosis or treatment. All that the plaintiff has alleged is that the defendants conducted a legitimate investigation into a substantial loss of money, that the funds were lost on her watch, and that the defendants terminated her after she violated their policies a second time while a legitimate investigation was ongoing. There is no evidence that the defendants' actions and intentions in this case rose to the level of extreme and outrageous conduct, went beyond all possible bounds of decency, or were utterly intolerable in a civilized community as courts applying New York law have construed those limits. *See, e.g., Spence v. Maryland Cas. Co.*, 995 F.2d 1147, 1158 (2d Cir.1993); *Wahlstrom v. Metro–North Commuter R.R. Co.*, 89 F.Supp.2d 506, 530 (S.D.N.Y.2000). The allegations are insufficient to constitute intentional infliction of emotional distress under New York Law. The defendants are therefore entitled to summary judgment on the plaintiff's claim.

### CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is granted. The Clerk of the Court is direct-ed to enter judgment and to close this case.

**SO ORDERED.**